```
 1                    UNITED STATES OF AMERICA
                     EASTERN DISTRICT OF MISSOURI
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,       )
                                     )
 4           Plaintiff,              )
                                     )
 5        vs.                        )   No. 4:14-CR-311 CEJ
                                     )
 6   CRISTOPHER M. CRISTEA,          )
                                     )
 7           Defendant.              )

 8

              TRANSCRIPT OF DETENTION HEARING
 9
          BEFORE THE HONORABLE CAROL E. JACKSON
10             UNITED STATES DISTRICT JUDGE

11                       May 20, 2015

12

     APPEARANCES:
13

     For Plaintiff:        Mr. Steven A. Muchnick
14                         OFFICE OF U.S. ATTORNEY
                           111 S. 10th Street
15                         20th Floor
                           St. Louis, MO  63102
16
     For Defendant:        Mr. N. Scott Rosenblum
17                         Mr. Gilbert S. Sison
                           ROSENBLUM AND SCHWARTZ
18                         120 S. Central Avenue
                           Suite 130
19                         St. Louis, MO  63105

20

21   REPORTED BY:          SUSAN R. MORAN, RMR, FCRR
                           Official Court Reporter
22                         111 South 10th Street
                           St. Louis, MO  63102
23                         (314) 244-7983

24

     Proceedings recorded by mechanical stenography, produced by
25   computer-aided transcription.
```

```
 1                        I N D E X

 2                           Direct   Cross   Redirect   Recross

 3   DEFENDANT'S WITNESSES

 4   JAMES GUNN
          (By Mr. Sison)          7
 5        (By Mr. Muchnick)                14
          (By Mr. Sison)                              20
 6
     STEPHEN KOENEMAN
 7        (By Mr. Sison)         24
          (By Mr. Muchnick)                32
 8
     CHRISTINA R. CRISTEA
 9        (By Mr. Sison)         33

10

11                        E X H I B I T S

12                           Offered      Received

13   DEFENDANT'S EXHIBITS

14
          A through C            52            53
15

16

17

18

19

20

21

22

23

24

25
```

1          (The following proceedings were held in open court

2     on May 20, 2015 at 10 a.m.:)

3          THE COURT:  This is United States versus

4     Cristopher -- is it pronounced Cristea?

5          MR. SISON:  Cristea.

6          THE COURT:  It's before the Court for a hearing on

7     the Defendant's motion to review and revoke the detention

8     order previously entered in this case.

9          As I understand it, the Defendant has some

10    additional testimony to present; that is, some witnesses who

11    were not previously called at the earlier hearing and who

12    have information that was not previously presented at the

13    earlier hearing.  Is that correct?

14         MR. SISON:  That is correct, Your Honor.

15    Essentially we have just -- a lineup for today just for the

16    Court's edification is we have four witnesses:  Mr. Jim Gunn,

17    Mr. Steve Koeneman, Mr. Andy Carter, and Ms. Christy Cristea,

18    who is the wife of the Defendant.  And then I have three

19    exhibits that I would proffer to the Court, which would be

20    Exhibit A, a proposed conditions of release; B, a letter from

21    his grandfather; and C, a letter from Brian Wandersee, who

22    would be his potential employer if he is to be released on

23    bond, Judge.

24         THE COURT:  I want to make sure I understand what's

25    really in dispute here.  In reading the detention order, the

1    conclusion that was reached by Judge Collins was that Mr. --

2    that there was probable cause to believe that Mr. Cristea had

3    committed a new offense while on bond, and that that caused

4    her to conclude that it was unlikely that he would abide by

5    any condition or combination of conditions of release.  I

6    don't read the detention order as being based on a concern

7    about potential flight.

8              MR. SISON:  That's correct, Judge.

9              THE COURT:  Is that right?  Is that your view also,

10   Mr. Muchnick?

11             MR. MUCHNICK:  Yes, Your Honor.  We did not bring in

12   any evidence of flight at the hearing before the magistrate

13   judge.  That wasn't our concern.

14             THE COURT:  Okay.  So here's what I'm probably going

15   to be very less interested in hearing is any testimony about

16   the availability of property or other security for the

17   Defendant's release.  Because that is -- that would be

18   relevant only if he presented a flight risk, and that's not

19   at issue here.

20             The focus I think needs to be on whether he presents

21   a danger to the community by virtue of the fact that

22   according to the previous finding, he was engaged in some

23   criminal conduct while on bond.  So --

24             MR. SISON:  It's --

25             THE COURT:  Go ahead.

1          MR. SISON:  And, Judge, I think the way that we

2     chose to address that, Judge, is because of the standard of

3     review for the factual findings of the magistrate are subject

4     to clear error.  We're not disputing the fact that the judge

5     found factually that there was probable cause that he

6     committed a crime, a new crime on that offense, and that it

7     was clear and convincing evidence that he violated a

8     condition of release.

9          Our essential attack on the magistrate's order

10    essentially is that basically that she erred when she did not

11    consider whether there were any less onerous conditions that

12    could be imposed that could satisfy the safety of the

13    community.  So, for example, our Exhibit A proposes at least

14    ten different conditions that we believe could address those

15    conditions, and some of the testimony will be to that effect.

16         The first two witnesses that I have, Mr. Gunn and

17    Mr. Koeneman, talk about the Defendant's history and

18    characteristics, you know, as a standing in the community and

19    whatnot.  So that's who I was going to put those up for.

20         Mr. Carter, because he is the in-law that posts the

21    property and basically acts as a third-party custodian, I can

22    drop him off if the Court is not interested in hearing that,

23    but just proffer the evidence of what he's willing to do and

24    what he's willing to subject himself to in the event that

25    Mr. Cristea does violate a condition of bond or doesn't show

1    up.

2           And then finally Ms. Cristea would testify regarding

3    what she's willing to do to make sure to ensure those

4    conditions are satisfied moving forward.

5           That would be the evidence that we'd present.

6    Because it's our position that while the judge did find that

7    he committed a new offense, all it does is establish a

8    presumption, a rebuttal presumption that no conditions of

9    release could satisfy the safety or reasonably assure the

10   safety of the community.  So it's our position and based on

11   the Eighth Circuit of *Abad,* it is our duty and our burden to

12   produce some evidence to rebut that presumption.  And once

13   that evidence is produced, the presumption still remains with

14   the Court for consideration.

15          But the ultimate question before the Court is are

16   these additional conditions that are being proposed by us,

17   could that reasonably assure the safety of the community.

18   That's the sum and total substance of today's testimony in

19   the hearing.

20          THE COURT:  All right.  Well, I'll listen to your

21   witnesses, but I probably do not want to hear testimony from

22   any witness who is going to talk about, as I said before, the

23   availability of property or other security to secure

24   Mr. Cristea's release or any testimony about anything that

25   would relate to the issue of flight.  I'm just not interested

1    in that.  Okay.

2              MR. SISON:  Okay.

3              THE COURT:  So go ahead and call your first witness.

4              MR. SISON:  Sure, Judge.  The first witness is

5    Mr. Jim Gunn.

6              May I proceed, Your Honor?

7              THE COURT:  You may.

8                        JAMES GUNN,

9    Having been first duly sworn, was examined and testified as

10   follows:

11                     DIRECT EXAMINATION

12   BY MR. SISON:

13   Q.    Would you please state your name for the record.

14   A.    James F. Gunn, G-u-n-n.

15   Q.    And, Mr. Gunn, what is your occupation?

16   A.    Attorney.

17   Q.    And who do you work for?

18   A.    Well, I was formerly a partner at Thompson Coburn; I'm

19   now retired.

20   Q.    And how long were you a partner at Thompson Coburn?

21   A.    I don't know, 16, 17 years, something like that.

22   Q.    And, Mr. Gunn, are you familiar with the Defendant in

23   this case, Cristopher Cristea?

24   A.    I am.

25   Q.    And tell me -- could you please tell the Court how you

1    know Mr. Cristea?

2    A.    Well, I was trying to remember when I first met him.  I

3    think I met him when he was at BJC working as a healthcare

4    planner.  And then I subsequently met him when he was the

5    executive vice president of an HMO, a health maintenance

6    organization, that I was involved with.

7    Q.    Okay.  And, Mr. Gunn, do you currently still have a

8    relationship with Mr. Cristea?

9    A.    I haven't talked to Cris in several years.

10   Q.    And the nature of your relationship with Mr. Cristea I

11   take it was a business relationship, would that be fair to

12   say?

13   A.    It was, although I met Mrs. Cristea socially.  I think

14   I met his kids socially.  So -- but it was 99 percent a

15   business relationship.

16   Q.    And can you tell me, I guess you gave the context of

17   how that business relationship arose.  Can you tell me the

18   nature of that business relationship, how it progressed over

19   the course of the representation?

20   A.    I don't remember the exact date, but I would presume

21   it's more than ten years ago, but I was called by the

22   president of the HMO and was asked to come out and meet with

23   him and with Cris to give them a primer on how management

24   buyouts work in the healthcare industry.

25   Q.    So you were negotiating a buyout, I take it, of an

1    entity, is that fair to say?

2    A.    Well, management was considering whether or not they

3    would become involved and try to assemble the financing

4    necessary to buy out their present plan, their present

5    employer.

6    Q.    And during the course of assembling this financing,

7    what kind of interaction did you have with Mr. Cristea?

8    A.    Well, I had very extensive interaction with Cris.  He

9    was the primary person that we relied on for the numbers.  He

10   also had a very clear understanding of the business and was

11   extremely valuable from the perspective of me putting

12   together the buyout.

13   Q.    And what was the end result of the buyout or -- what

14   eventually happened in the course of this, you assembling

15   financing?

16   A.    Well, it was extremely successful.  We -- management

17   was successful in purchasing the business from Tenet

18   Healthcare.  They wanted to sell and my clients wanted to

19   buy, so that always makes for a good start.  And then

20   eventually we got involved in a very complicated arrangement

21   with Mercy Healthcare plan.  And -- but we concluded that

22   transaction about three or four years after the original

23   buyout.  And then about five years after that a large HMO

24   from California purchased the Mercy Healthcare plan.

25   Q.    And was Cris involved in those other incidences as

1    well?

2    A.     100 percent, he was a key -- he was a key participant

3    from the beginning to the end.

4    Q.     And how would you judge him?  How would you describe

5    him as a business person?

6    A.     Well, I used to always say he's smart beyond his years.

7    He's a young -- I considered him a kid, to be honest, a young

8    person -- I shouldn't say a kid -- but a young person,

9    extremely bright.  But I knew that because I knew his boss at

10   BJC had told me that he had hired somebody and that he was

11   really pleased with him.

12          But the big thing is is that Cris understood the

13   business like nobody understood the business.  I mean, he was

14   extremely knowledgeable about his business.

15   Q.     And did you ever have any -- during the course of that

16   representation to make sure that these projects went through,

17   were there any times where you thought that Cris maybe didn't

18   know something but he was quick to pick it up?

19   A.     Sure.  Yeah, Cris was not involved -- had never been

20   involved in a sale or an acquisition of a business per se,

21   and so he had a lot to learn from that perspective.  But

22   sure.  And there are complicated documents, there's a lot of

23   due diligence you have to do.  There's management

24   representations that have to be given.  But Cris, he was a

25   quick learner.

1    Q.    And so I take it at some point during you assembling

2    the finances that you were required to give him certain

3    instructions that he had to follow to make sure these

4    projects went through, would that be fair to say?

5    A.    Oh, sure.  The management team, which really consisted

6    of Cris and his boss, they relied on me to walk them through,

7    so to speak, the acquisition.  I understand their business a

8    little bit -- well, more than a little bit.

9    Q.    One of the things that my limited understanding of

10   mergers and acquisitions, things when you do due diligence

11   like seller's representations and warranties, would that be

12   correct?

13   A.    That's correct.

14   Q.    And what role did -- I assume Cris had no knowledge of

15   that prior to doing this, so what role did you have in terms

16   of instructing him regarding the seller's representations and

17   warranties.

18   A.    Well, the attorneys in my office, we had to divide up

19   the due diligence.  And there's different areas that you have

20   to do it.  It's a long involved process.  But different

21   lawyers work with Mr. Linder, Cris's boss, and Cris on going

22   through all the items of the representations so that when we

23   finally gave them to the seller, they would be -- or to the

24   purchaser, they would be true.

25   Q.    And were these facts and disclosures that were required

1    to be compiled by Mr. Cristea?

2    A.    Oh, sure, yeah.  Yeah, there's a lot of financial

3    representations that are made with respect to the financial

4    statements for the entity.  And there's also a lot of, if you

5    want to call them healthcare statistics, for instance, usage

6    data, like the stay data for people who have been

7    hospitalized, usage data; that is, people who use medical

8    services.  And Cris maintained all of those, the details of

9    all of those within the office.  He didn't himself do it, but

10   he had a staff that maintained all of that.

11   Q.    And did you feel that he was aboveboard with you in

12   terms of pulling this information together and not leaving

13   anything out or whatnot?

14   A.    100 percent.  There was never any question.  If he had

15   any question about a fact, he would raise it either with me

16   or with the lawyer that he was working with, that lawyer

17   would raise it with me, and I would get it resolved.  But,

18   no, Cris was 100 percent honest.

19   Q.    And as a matter of fact, would it be fair to say you

20   were impressed with his, I guess his work ethic, his business

21   acumen, that you actually recommended him for a job, did you

22   not?

23   A.    I did.  I did.  I had a great number of clients in the

24   HMO field, and one of them was looking for a new CEO.  And

25   after we concluded the buyouts, I guess it would be the third

1   buyout that I was involved with Cris, I recommended him for

2   the CEO position, and he was actually interviewed for it.

3   They were very impressed with him.  They loved his knowledge

4   of the field.  But the owner in California wanted to bring in

5   a person that he had worked with before, and they brought in

6   a CEO from California.

7   Q.    And why were you willing to make such a personal

8   voucher on behalf of Mr. Cristea to some of your big clients?

9   A.    Well, I thought that he had a good amalgam of knowledge

10  and integrity.  Honestly I would have never recommended him

11  if I didn't think he was 100 percent honest.

12  Q.    Now, are you familiar with the charges in this case,

13  Mr. Gunn?

14  A.    I really am not, I'm sorry.

15  Q.    Mr. Cristea is accused of fraud, is accused of making

16  misrepresentations.  And his last bond hearing he was accused

17  of -- there's probable cause found that he had committed a

18  new crime, which was essentially lying on a loan information

19  form.  Does that surprise you?

20  A.    100 percent, I wouldn't believe that unless you just

21  told me or we weren't in this setting before Her Honor.

22  Q.    Despite knowing that, has your opinion of Mr. Cristea

23  changed, the fact that he's going through this criminal

24  proceeding now?

25  A.    No.  No, I can't -- I'd have to know a lot more about

```
1    it.  And I know sometimes these things get extremely
2    complicated, and representations that are made are extremely
3    complicated, so no, that wouldn't change my opinion of Cris
4    one iota.
5    Q.    And just in terms of your dealing with him personally,
6    you know, as you sit there today and based on your experience
7    with dealing with him, I think it's the Government's fear is
8    if he's released out into the community he could commit more
9    fraud without some other conditions that were in place.  What
10   is your opinion of his danger to the community of him
11   committing those type of acts?
12   A.    Zero.  I mean, from what I've known and my direct
13   relationship with him, et cetera, et cetera, I would not be
14   concerned at all about that.
15            MR. SISON:  I have no further questions, Your Honor.
16            THE COURT:  Mr. Muchnick.
17                     CROSS-EXAMINATION
18   BY MR. MUCHNICK:
19   Q.    When did you say was the last time that you dealt with
20   Mr. Cristea?
21   A.    It had to be several years ago.  I've been --
22   unfortunately I had a bad medical procedure that went wrong
23   and I haven't practiced law for almost three years, so I
24   would think that it's four or five years ago.
25   Q.    So you never dealt with him while he was in the, say,
```

1    exploration for minerals business, correct?

2    A.    I -- my recollection is that Cris told me that -- wait

3    a minute, I shouldn't say that.  The attorney/client

4    privilege is still -- I don't want to waive it.

5          I'm aware that Cris was looking into the

6    possibility, I thought it was copper mines.  I referred him

7    to somebody else at Thompson Coburn since that's not my area

8    of expertise at all.  And to begin with, yeah, I don't think

9    we represent him.  I'm not sure.  I don't think we do.

10   Q.    Well, so you had -- I'm asking about your personal

11   knowledge.  You had no knowledge of what he may or may not

12   have done in connection with this business, correct?

13   A.    No, I have no knowledge of what he did or didn't do

14   with respect to mining.

15   Q.    Now, you've been involved, I assume, with financing and

16   things like that?

17   A.    Sure.

18   Q.    And applications for --

19   A.    Yes.

20   Q.    -- loans from financial institutions and things like

21   that?

22   A.    Yes, sir.

23   Q.    And I assume you've dealt with applications, say, from

24   requesting loans from banks?

25   A.    Sure.

1    Q.    Sure.  And so you know the procedure that's followed,

2    correct?

3    A.    Yes, sir.

4    Q.    And there's usually an application, correct?

5    A.    Yes, sir.

6    Q.    An application for a loan.  And because banks, you

7    understand, you know are federally insured, correct?

8    A.    Correct.

9    Q.    So applications for bank loans are made under penalties

10   of perjury, you are required to tell the truth on those, are

11   you not?

12   A.    Yes, sir.

13   Q.    So if there's an application for a bank loan and a

14   person is asked whether they've ever been audited by the IRS,

15   are they required to tell whether they've been audited by the

16   IRS?

17   A.    I missed the question.

18   Q.    If the application on a bank loan for a bank loan asks

19   whether the person has ever been audited by the IRS, are they

20   required to tell the truth as to whether or not they've been

21   audited by the IRS?

22   A.    Of course.

23   Q.    And if they don't, is that a false statement on a bank

24   application?

25   A.    Yeah.  I mean, it gets a little complicated because the

1   word "audit" is a very broad term in terms of business.

2   So -- but if there had been an actual audit and the taxpayer

3   knew that there had been the audit and he or she said no, I

4   was never audited, that would be a misrepresentation.

5   Q.    Okay.  And if the application for a bank loan asks

6   whether they are involved in a lawsuit or something like that

7   and, in fact, they've been indicted at the time, would that

8   be a false statement?

9   A.    Again, "involved in a lawsuit" is different than an

10  indictment for a crime.

11  Q.    Well, here, let me ask the question here.

12  A.    I don't know the facts here, sir.

13  Q.    It says, "Are you a defendant in any suit or legal

14  action?"  And if at the time that that answer was answered

15  no, if the person was the subject of a federal criminal

16  indictment, would that be a false answer to the question,

17  "Are you a defendant in a legal action?"

18  A.    You know, that's not an easy answer.  That's not an

19  easy answer because --

20  Q.    What's hard about it?

21  A.    Well, part of it is is the defendant in a legal

22  proceeding or a legal action, I would -- that sounds like a

23  civil action that they are talking about, so --

24  Q.    Well, here, let me ask you this question.

25  A.    Yeah.

1    Q.    This is a hypothetical question, but you're a lawyer

2    and you've been a lawyer for a long time.  If a client came

3    to you and said, look, I've been indicted by a federal grand

4    jury and I'm applying for a bank loan and it asks me the

5    question, "Are you a defendant in a suit or a legal action,"

6    How would you ask them to respond to that question?  How

7    would you direct them to answer?

8    A.    I would respond by giving the facts of the criminal

9    indictment.

10   Q.    So you would say yes as opposed to no?

11   A.    I don't know if I would say yes because I don't know if

12   the answer to that question is yes.  But I would point out

13   the facts of the criminal indictment.

14   Q.    And you understand when you file an application for a

15   bank loan, you're required to give a financial statement

16   usually?

17   A.    Yes, sir.

18   Q.    And if on that financial statement you represent that

19   you have $13 million in assets and securities, stocks or

20   bonds or mutual funds, when that's not true, would that be a

21   false statement?

22   A.    Absolutely.

23   Q.    So -- okay.  Now, you're familiar with how investments

24   work, are you not?

25   A.    I believe so.

1    Q.    Are you familiar with the term, just for lack of a term

2    of art called a "Ponzi scheme," do you know what that is?

3    A.    I do.

4    Q.    Okay.  Would you consider it a Ponzi scheme if money

5    from one investor is shown to be transferred to another

6    investor to pay off another investor?

7    A.    Well, that's the general definition of a Ponzi scheme.

8    Q.    So that --

9    A.    But it's so fact specific.  I've seen some very

10   complicated arrangements that I thought were Ponzi schemes

11   but weren't or were determined by a court not to be.

12   Q.    But if money was deposited into an account by one

13   investor and was removed from that investor's account and

14   paid to another investor, would you consider that to be a

15   Ponzi scheme?

16   A.    Just those facts, no, I would not probably consider

17   that to be.  There has to be, as I understand it, for a Ponzi

18   scheme there has to be an intent to defraud.  And just those

19   facts in and of themselves, I'm not sure that they say to me

20   that there's an intent to defraud.  People quite often use

21   money that is brought in for one purpose to pay off bills

22   that they accumulate from other purposes.  So the fact that

23   they do that does not say to me that this is a Ponzi scheme.

24   Q.    Okay, that's fine.  One final question.  If, say, the

25   person who is running an investment scheme sends

1    correspondence to an investor that reflects amounts held in

2    various accounts that don't exist, would you consider that to

3    be fraudulent?

4    A.    Yes.

5              MR. MUCHNICK:  That's all I have.

6              THE COURT:  Any redirect?

7              MR. SISON:  Yes, Your Honor.

8                        REDIRECT EXAMINATION

9    BY MR. SISON:

10   Q.    Mr. Gunn, Mr. Muchnick cross-examined you on -- what I

11   want to focus on was this notion of disclosures in a loan

12   information form.  And you indicated there was some language

13   that the U.S. Attorney brought up saying, "Are you currently

14   a party to any legal action or proceeding?"  Is it fair to

15   say that that phrase could be interpreted by a reasonable

16   person to be a legal, a civil legal action as opposed to a

17   criminal legal action?

18   A.    It does to me.

19   Q.    Now, the lawyer in us would obviously counsel a client

20   to be conservative and say, well, I would probably interpret

21   that, but you would agree --

22   A.    I would explain it because you're better off to explain

23   than we are to seek forgiveness.

24   Q.    Right.  But the point is at least based on what you

25   heard from Mr. Muchnick, it would be a reasonable

1    interpretation to look at that as just participation in a

2    civil proceeding?

3    A.    That's the way I interpreted it when I heard it, so

4    yes.

5    Q.    And a lot of these -- let's step back for a minute.

6    Just making a wrong representation on a bank form isn't

7    sufficient to be criminal, there has to be some intent,

8    correct?

9    A.    Isn't sufficient to what?

10   Q.    Just because you make a wrong statement on a bank form,

11   a financial form, doesn't necessarily make it criminal,

12   doesn't there have to be intent?

13   A.    Sure.

14   Q.    Okay.  And just for example, you noted the notion about

15   the audit, the IRS audits, and how that could be as you noted

16   it was broad, it could be interpreted broadly, correct?

17   A.    Correct.

18   Q.    So without knowing what the other side is going to say,

19   the defendant is going to say as to why they put something

20   here, there, or why they made that representation, can you

21   conclude that it was a criminal act?

22   A.    No.

23   Q.    Okay.  And the same thing with the 13 million in

24   securities that was purported to be a misrepresentation.  I

25   think the testimony at the hearing was the government

1    couldn't find any evidence of that, any evidence of

2    securities like that in the account.  But would you be

3    comfortable coming to the conclusion that a criminal act has

4    been committed without hearing from the other side as to why

5    they put that $13 million down?

6    A.    No, I'd have to know all the facts.

7    Q.    Okay.  Now, you talked about -- Mr. Muchnick had talked

8    to you about Ponzi schemes, and generally the definition is

9    paying off one investor from the funds of another investor;

10   is that correct?

11   A.    With the intent to defraud the first investor.

12   Q.    But you actually noted that there were certain

13   situations where money was being used, taken in for one

14   purpose and used for another purpose.  Is that correct?

15   A.    It happens every day, people take money in and they use

16   it to pay their debts.

17   Q.    Right.  And that doesn't necessarily make it criminal,

18   does it?

19   A.    Of course not.

20   Q.    Are you familiar with the term of a "cooperative"?

21   A.    Sure.

22   Q.    What in your mind is a "cooperative"?

23   A.    Well, a cooperative is where more than one person

24   invests with the idea that the entirety of the people who

25   invested are the owners.

1    Q.    Okay.  So technically you could have a situation where

2    Investor A puts money into a cooperative fund, which my

3    understanding is a pooling of funds; is that correct?

4    A.    Is a what?

5    Q.    A pooling of funds?

6    A.    A pooling of funds, sure.

7    Q.    And technically Investor A could put in money to this

8    co-op, but then Investor C could actually take it out or

9    potentially take it out under certain circumstances?

10   A.    It depends on what the cooperative agreement says.

11   Q.    Correct.  But that's your understanding of what a

12   cooperative could potentially do?

13   A.    Of course.

14   Q.    Okay.  And without knowing whether or not this

15   investment was a cooperative or not, are you comfortable

16   making some sort of determination as to whether or not it's

17   fraudulent?

18   A.    No.

19   Q.    And despite all that you've heard from Mr. Muchnick

20   today, does it change your opinion as to whether or not you

21   believe Mr. Cristea is a danger to the community?

22   A.    No, it doesn't change my opinion a bit.

23            MR. SISON:  That's all I have, Your Honor.

24            THE COURT:  Thank you.  You may step down.

25            THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Please call your next witness.

2          MR. SISON:  Defense would call Mr. Steve Koeneman.

3                    STEPHEN KOENEMAN,

4    Having been first duly sworn, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7    BY MR. SISON:

8    Q.    Would you please state your name for the record.

9    A.    Stephen Koeneman.

10   Q.    And, Mr. Koeneman, what is your occupation?

11   A.    Currently I am a retired minister, but I work as a

12   community service officer for the City of St. Peters.

13   Q.    Okay.  And what do you do for the City of St. Peters?

14   A.    We provide security for the mayor and board of aldermen

15   at the aldermen's meeting.  I am a bailiff for the judge at

16   municipal court.  And we provide security to the City

17   sporting events.

18   Q.    Mr. Koeneman, do you know the Defendant, Mr. Cristopher

19   Cristea?

20   A.    I sure do.

21   Q.    And could you tell the Court how you know him?

22   A.    I first met him 15 years ago when he and his family

23   were looking for a church and actually a school.  And we had

24   a church and a school, and that's how we made our first

25   connection.

```
 1    Q.    And what was the name of the school and the church?

 2    A.    Willott Road Community Church and Christian Academy.

 3    Q.    And can you describe the nature of your relationship

 4    today with Mr. Cristea?

 5    A.    We're friends.

 6    Q.    And how would you describe that friendship?

 7    A.    It's the closest friendship I have other than my wife

 8    and family.  We're good friends.  We work together, have the

 9    same dreams and aspirations, and it drew us together.

10    Q.    As a matter of fact you were -- you visited -- he is

11    currently being incarcerated in Lincoln County Jail.  Have

12    you had occasion to visit him there?

13    A.    Yes.

14    Q.    And what was the nature of your visits with

15    Mr. Cristea?

16    A.    Just to offer moral support and, you know, show

17    interest in him, try to encourage him.

18    Q.    Okay.  And has it been difficult for him there?

19    A.    I'm sure it has, but Cris is a strong man and he seems

20    to face every situation with pretty much the same hope and

21    determination to make something good out of it.

22    Q.    Now, Mr. Koeneman, when you knew him, how involved was

23    he in church activities?

24    A.    Extremely involved.  He was a part of the day-to-day

25    operations, served in many volunteer positions in the church
```

1    and school.  And he -- I think his last bit of service was he

2    served as our treasurer and a trustee of the church.

3    Q.    Was he also involved in the building committee?

4    A.    Yes, very much.  He was president of the building

5    committee.

6    Q.    And what was the purpose of the building committee?

7    A.    We purchased 36 acres.  We were going to relocate.  We

8    only had four acres where we were at.  We were out of room,

9    and the school and church were growing and so we purchased

10   36 acres with the hope of relocating there and expanding.

11   Q.    And did he ever have occasion to help the church out

12   when it was in financial need?

13   A.    Yes.

14   Q.    And can you give us some circumstances of when that

15   might have happened?

16   A.    Yeah, there's at least two, maybe three occasions when

17   we had a capital campaign, I believe it was around

18   $30 million was committed.  There were a couple of large

19   donors.  Unfortunately at the same time that giving began the

20   land was purchased and the financial crunch hit and some of

21   those funds that those contributors were expecting were

22   delayed.  So we were struggling, and our school enrollment

23   was down.  We were struggling to make the mortgage payments

24   on the land that we bought.  And the bank was working with

25   us, but it had gotten to a point where they were pressured,

1    and so we needed to make some payments that were not

2    available.  And Cris stepped in and wrote some large checks

3    to help get us through from month to month.

4    Q.    Okay.  And did he do also I guess other smaller things

5    for the church and its parishioners?

6    A.    Extremely, yeah.  He led our worship team.  He really

7    was involved in almost every facet.  It was kind of whatever

8    needed to be done, Cris was always there.  And at our school

9    he came and volunteered to work with the kids in some

10   athletic programs.  He worked in our sound.  He was extremely

11   involved.

12   Q.    So he was not just involved with church leadership, he

13   was involved with a lot of members of the church body as

14   well?

15   A.    Absolutely, yeah.

16   Q.    And how was he perceived, his reputation among church

17   going members when you were pastor there?

18   A.    He was well loved and admired by most, yeah.  Cris had

19   a very positive attitude.  He was always there to help.  He

20   was extremely generous in helping people in our church who

21   had need, and he did it anonymously most of the time.  He

22   didn't want anybody to know where it came from.

23   Q.    Can you give an example of an anonymous aid or help

24   that he gave to the church?

25   A.    Sure.  To a family?

1    Q.     Or just to the church or families, yes.

2    A.     To both, there's many.  I know one family that he

3    helped pay their tuition.  He paid off their credit cards.

4    He provided plastic surgery for people who needed assistance

5    there.  It wasn't unusual for him during the holidays,

6    especially at Christmas, he or his wife to hand me a pack of

7    $100 gift cards to Wal-Mart and say, "Give them out to people

8    who you feel they need them, but I don't want them to know it

9    came from me."

10   Q.     Now, it's my understanding in reading through some of

11   the discovery that there might have been some I guess

12   dissatisfaction when Cris served as the treasurer or the

13   trustee from some members of the church.  Can you sort of

14   explain that as best that you can?

15   A.     Sure.  There was one occasion on the -- I think it was

16   the last time that Cris bailed us out again, we were sitting

17   in my office with the bank president or vice president, I

18   believe at the time, my administrator, myself, and Cris.

19   Because Cris had not been involved with us through all those

20   negotiations, the loans for the land and the whole process.

21   And we needed to make a payment, which we did not have the

22   resources to make at that time.  And so Cris wrote a check

23   out, I want to say it was for $25,000.  And I said, "Oh,

24   Cris, you don't have to do that, you know, it's not on

25   your shoulders alone."  And he said, "Well, there's not

1    really anybody else at this point who can do that," so he

2    wrote out that check.  And I said, "Well, I want you to know

3    this is a loan and we will pay you back every penny of that

4    loan."

5            I believe that was in the spring, I want to say

6    February or March.  It was probably -- and we were not able

7    to make -- we were still struggling, we were not able to pay

8    him back at all.

9    Q.    So what was the nature of some members being upset with

10   that?

11   A.    He was -- I think it was around September or October.

12   His children attended our school.  His tuition was due.

13   While in talking with our financial secretary, he told her

14   just to transfer the funds from that loan to his tuition and

15   basically that would be part of his repayment.  And so she

16   did that.  I guess she was uncomfortable, she went to the

17   administrator and said she was uncomfortable, and he came to

18   me.  And I said, "I don't really have a problem with that."

19   The process wasn't the best, but we have a trustee's meeting

20   every month, we get a complete report of every dime that

21   comes in and goes out.  And at that trustee's meeting we'll

22   tell them what's happened and get their approval.

23           And I believe the meeting was like a week, week and

24   a half later.  We did tell them what happened, and they

25   agreed that was not a problem.  And that was the only

1    occasion where there was any concern at all.  And I really

2    believe that that was -- the motivation for the

3    administrator's discomfort with that was because he was

4    jealous of Cris and his abilities and I think his standing in

5    the church.

6           THE COURT:  Excuse me, Mr. Sison, I'm having a

7    little trouble figuring out where all of this is going and

8    how this testimony is going to be helpful to the issues that

9    I have to decide.

10          MR. SISON:  Well, Judge, it just goes to his

11   character.  And I know that this was out there, I'm trying to

12   front up what I think is going to be the cross-examination of

13   this witness.  But basically Mr. Koeneman served as a

14   character witness.  I'm almost done actually.

15          THE COURT:  Well, you know, I don't think there is

16   any reason to doubt that the witnesses that you call are

17   going to be able to testify to Mr. Cristea's character and

18   the positive and beneficial things that he has done in his

19   career and in his community.  I just don't know that that is

20   going to be helpful to me in making my decision.

21          MR. SISON:  Well, Judge, I would simply put it out

22   there as this is what he's done in the past, this is a

23   representation of what he's done in the past, and, therefore,

24   can -- his involvement in the community, his involvement in

25   the church, his extensive involvement is an indicator that he

```
 1    does not present that danger to the community, and so that's

 2    sort of what this evidence is designed to show.

 3              THE COURT:  Okay.  All right.  Well, if you've got

 4    one or two more questions, that's fine.

 5              MR. SISON:  Sure.

 6              THE COURT:  Otherwise, open it up to Mr. Muchnick.

 7    BY MR. SISON:

 8    Q.    Mr. Koeneman, just one final question.  Knowing --

 9    you're a pastor, correct?

10    A.    Correct.

11    Q.    You've had the occasion to deal with many different

12    types of people, many different personalities?

13    A.    Correct.

14    Q.    You have to be a judge of that personality?

15    A.    Correct.

16    Q.    And a judge of that character, would that be fair to

17    say?

18    A.    Yes, sir.

19    Q.    You've heard all the evidence here of the prior

20    witness.  Having heard that about the allegations against

21    him, does that change your opinion whether you'll believe

22    he'll be a danger to the community?

23    A.    No, not one iota.

24              MR. SISON:  That's all I have, Your Honor.

25              THE COURT:  Mr. Muchnick.
```

CROSS-EXAMINATION

BY MR. MUCHNICK:

Q.    What was the time period which this was going on?  You
said February, March.  February, March of this year?

A.    Oh, no, sir, it probably would have been 2010.

Q.    2010?

A.    Yes, sir.

Q.    Okay.  Would it change your opinion about Mr. Cristea
if you knew that the money that he gave to the church came
from investors in mineral exploration and mining activity who
he didn't pay back, would that change your opinion of him?

A.    I'm not aware of those facts.

Q.    But if you knew that, if you knew that, would that
change your opinion?

A.    No.

Q.    It wouldn't?

A.    I'd be disappointed, but no, it wouldn't change my
opinion.

Q.    That the money that he was paying to the church came
from investors who were investing in a business who, for lack
of a better word, got stiffed, that wouldn't change your
opinion?

A.    No.  No, I know Mr. Cristea to be a good man, the most
generous man I've ever known.

          MR. MUCHNICK:  Thank you.

```
 1              MR. SISON:  Nothing further for this witness.

 2              THE COURT:  You may step down.  Thank you.

 3              THE WITNESS:  Thank you.

 4              MR. SISON:  Given the Judge's direction, I'm just

 5     going to forego calling Mr. Carter, and I will call as a

 6     final witness Ms. Christy Cristea.

 7              THE COURT:  All right.

 8              MR. SISON:  May I proceed, Your Honor?

 9                       CHRISTINA R. CRISTEA,

10     Having been first duly sworn, was examined and testified as

11     follows:

12                       DIRECT EXAMINATION

13     BY MR. SISON:

14     Q.    Would you please state your name for the record.

15     A.    Christina R. Cristea, C-r-i-s-t-e-a.

16     Q.    And, Ms. Cristea, what is your current occupation?

17     A.    I'm a mother and wife, and I cater.

18     Q.    And, Ms. Cristea, can you please describe the nature of

19     your relationship with the Defendant, Mr. Cristea?

20     A.    He's my husband of almost 19 years, my best friend, and

21     the father of all my children and my partner in every way.

22     Q.    Okay.  And how many children do you have?

23     A.    We have four.

24     Q.    And what are the ages and names?

25     A.    Alexandre is our oldest son.  He's almost 18 years old
```

1    and a senior in high school.  We have Andrew, who is our

2    second son.  He will be 15 in December and he is just

3    graduating from eighth grade.  We have a third son, Aiden,

4    who just turned ten on March 25th of this year.  And our

5    daughter Abigail is eight and a half years old.

6    Q.    And just briefly for the record, you know, because I

7    think we know what you're going to say, but can you describe

8    briefly, as briefly as you can what his qualities as a

9    husband are?

10   A.    Cris is the kindest man I've ever known in my life.  We

11   have an extraordinary marriage.  He is just -- I mean, he's

12   gentle, he's patient.  He just -- you know, he's the kind of

13   husband that just a day never goes by where he doesn't hug me

14   or kiss me or assure me that I'm the love of his life.  He's

15   very attentive.  I just -- I mean, we just have a wonderful

16   marriage.  It's just extraordinary.

17   Q.    Would you also describe -- how would you describe him

18   as a father to your children?

19   A.    They are just -- he's involved in every aspect of their

20   lives.  He is an educator and he's passionate.  He loves on

21   them and takes them places.  He coaches their sports teams.

22   He tutors algebra.  He keeps score at basketball games and

23   reads for Scholar Bowl.  He takes them to and from school.

24   I'm not really a morning person so he's very willing and able

25   to get them up in the morning and help with breakfast and

1    find uniforms, put air in soccer balls.  It seems with three

2    sons that's always an issue.  He just -- I mean, he

3    participates in every single way and always has from the

4    moment they've been born.

5    Q.    Now, Ms. Cristea, you understand why Cristopher has

6    been -- how long has Cristopher been incarcerated for?

7    A.    I believe 84 days today.

8    Q.    So almost three months?

9    A.    Yes.

10   Q.    And do you understand why he's being incarcerated?

11   A.    I understand what he's being accused of.

12   Q.    Well, one of them was not following the conditions of

13   release, and the other one was that there was probable cause

14   to commit a crime -- that he committed a crime while on bond,

15   on release.  And so the ultimate question the Court has to

16   answer is are there any conditions that could be imposed that

17   could reasonably assure the safety of the community.  Did we

18   discuss some of those proposed conditions that we were going

19   to propose to the Court today?

20   A.    We did discuss some.  But I don't -- I don't consider

21   Cris a danger to the community.  He's just -- he's a

22   wonderful man.

23   Q.    And that's -- and I get that.  But the government has a

24   viewpoint too that has to be addressed.

25   A.    Absolutely.

1    Q.    And that's what we're trying to do.  The first thing --

2    well, first of all, what role did you play in the

3    satisfaction of his conditions prior to his arrest?

4    A.    Unfortunately I didn't, and that is my failing.  I

5    never read the bond revocation -- please excuse me if that's

6    wrong, but the --

7    Q.    The conditions of release?

8    A.    The conditions of release, yes.  And I should have.

9    I'm very unfamiliar with legal practices.  And as I

10   mentioned, we're very close and that is my failing.  And I

11   should have been more educated so that I could support him

12   and ask questions.

13   Q.    But you were around whenever -- there were certain of

14   the conditions of release you were privy to.  For example, do

15   you recall when he was required to remove all weapons from

16   his house?

17   A.    Yes, I do.

18   Q.    Okay.  And did he do that?

19   A.    He did that the afternoon when he came home, yes, on

20   October 3rd.

21   Q.    Do you recall also whether he was ordered to turn over

22   his passport?

23   A.    Yes, I do.

24   Q.    And what do you recall happening with that?

25   A.    I believe that it was actually with him.  He keeps it

1    in his work backpack, and it was with him the day of his

2    arrest, and my understanding is he turned it in at that time.

3    That could have happened within the next couple of days, but

4    I believe he did actually turn it over at that time.

5    Q.    And the results -- so there was also I guess for lack

6    of a better term, a question of whenever -- did he ever call

7    his pretrial officer when he wanted to go somewhere?

8    A.    Yes, he did, he spoke with his pretrial officer every

9    Tuesday during this time.

10   Q.    Okay.  Do you remember a specific instance where he

11   asked for permission to go somewhere outside of the greater

12   St. Louis metropolitan area?

13   A.    Not out of the St. Louis area that I'm aware.  I know

14   he asked permission to go to our son's college in Rolla.

15   Q.    Which is outside of the --

16   A.    I didn't know that.  I apologize.  Yes, to go on a

17   college visit to Rolla.

18   Q.    And do you know whether he was required to ask for

19   permission to go to Rolla?

20   A.    My understanding was that he needed to notify them.

21   Q.    And he did that?

22   A.    And he did, yes.

23   Q.    There was also a situation with an outstanding warrant,

24   a traffic warrant.  Do you recall that?

25   A.    I recall him mentioning it to me.  I vaguely remember

1    when he got the note about that that he kind of seemed

2    perplexed.  He wasn't aware that it was out there.  That is

3    definitely not something that we would have let just slide

4    by.

5    Q.    And did he do -- what did he do to fix it?

6    A.    He contacted his attorney and asked what needed to be

7    done to resolve this issue.  I think with the current

8    circumstances he wanted to make sure that was handled

9    appropriately.

10   Q.    And then there was an issue, obviously the last hearing

11   there was an issue of third-party notification, who he was

12   required to notify and he was not required to notify.  Were

13   you ever privy to any of his conversations between

14   Mr. Cristea and his pretrial officer?

15   A.    Yes, I was.

16   Q.    And what was your understanding of the nature of his

17   third-party notification?

18   A.    I know that Cris asked Ms. Janes several times what

19   exactly was meant by notification and who he had to notify,

20   if it was people with the current indictment or current

21   businesses.  And the way that I understood it was that he

22   needed to notify any new investors or people that he was

23   soliciting funds from, I think.  And I do know that he hadn't

24   done that.  There were a multitude of people in our life,

25   just because of the nature of business it involves family and

1    friends that knew about the indictment anyway.

2    Q.    So at the hearing there was evidence of a wire transfer

3    coming in on the day that he was arrested.  So would that be

4    considered a new investor as far as you're concerned?

5    A.    No, I actually know that it was not.  That was

6    unfortunate timing.  First of all, the uncle to which that

7    money is referred is not an investor.  He's a participant in

8    the cooperative for our Charis -- it's not Charis Mining --

9    well, the Charis Cooperative -- excuse me -- in Africa.  And

10   he's not new because he has done business with Cris before.

11   It was successful.  He moved money and Cris was able to flip

12   it -- excuse me, flip it and make a profit for him.  I can't

13   speak to those numbers, but I know that he was thrilled.

14           And I know that he called Cris, I don't know the

15   exact time, but I heard him talking about it a good month or

16   two, maybe over the summer prior to October about doing that

17   again for him.

18   Q.    Prior to being arrested?

19   A.    Oh, yes, months before.

20   Q.    Prior to the indictment being issued?

21   A.    Yes, sir.  And -- oh, I'm sorry.

22   Q.    And the other one was there's no other evidence of a --

23   I think it was Suzanne Hooper, is that correct, that had

24   given money post, like in November?

25   A.    Uh-huh.

1    Q.    How would you characterize that relationship as a

2    potential new investor?

3    A.    That was not investment money.  We've known Suzanne --

4    well, I don't know how long Cris has known Suzanne, I believe

5    since he was a teenager, but I have known Suzanne since

6    before we got married.  She has been a dear family friend and

7    in our life always.  She helped plan our wedding and she's

8    babysat my kids.  And she is aware of what we're going

9    through and that it has caused hardships, and she offered

10   that as a gift to help us, I mean, with just expenses.

11          THE COURT:  I'm sorry, Mr. Sison.  I'm not sure I

12   know what the witness is testifying about.  Who is Suzanne?

13          MR. MUCHNICK:  Your Honor, I think we've got a

14   problem here in that Miss Hooper is not somebody who was the

15   subject of the hearing before Judge Collins.  That investment

16   was not one of the ones that was discussed at that hearing.

17   It's a completely different matter.

18          MR. SISON:  I apologize, Judge.  I'll move on.

19          THE COURT:  Okay.

20   BY MR. SISON:

21   Q.    Well, Christina, we're here to figure out whether there

22   are any conditions that could be imposed that could

23   reasonably assure the safety of the community.  Because the

24   Government's position is this, the allegations against

25   Mr. Cristea is that he committed fraud and that he's made

1    misrepresentations and that he's committed an offense,

2    probable cause that he's committed an offense while on bond.

3    So to assure this Judge that there are reasonable conditions

4    that could be imposed, one of the things that we propose that

5    he be subjected to electronic monitoring and home detention.

6    Is that something that you would be opposed to?

7    A.    I would not.

8    Q.    The other matter that we would be willing to do is have

9    third-party custodians that would essentially act as risk

10   takers for Mr. Cristea.  One of those risk takers is your

11   father-in-law; is that correct?

12   A.    Yes.

13   Q.    And he was willing to testify -- what was he willing to

14   do to act as third-party custodian?

15   A.    Well, when you said father-in-law, I believe you mean

16   Andy Carter.

17   Q.    Yes, Andy Carter.

18   A.    And he would be my stepfather.

19   Q.    Yes.  And what is your understanding of what he's

20   willing to do to vouch for Mr. Cristea?

21   A.    My understanding is he's willing to pose the equity in

22   his homes.

23   Q.    Okay.  And he has multiple homes?

24   A.    Two.

25   Q.    Two homes, okay.  And he's willing to do this despite

1    the fact that, you know, he's already been found to have

2    violated the conditions of release before, and that if he

3    violates it again, he potentially could have the government

4    be a lienholder on his property?

5    A.    Yes, sir, he is.  He's not concerned about Cris.

6    Q.    Okay.  The other thing that that we have done is that we

7    have asked that he be prohibited from incurring new credit

8    charges, opening additional lines of credit, and/or applying

9    for any loan without the written permission of the Pretrial

10   Services Office.  Is this something you're willing to police

11   and make sure this doesn't happen?

12   A.    Absolutely.

13   Q.    The fourth matter is the Defendant shall not create,

14   operate, manage or participate in the creation, operation, or

15   management of any business entity or venture including a

16   family business, without the written permission of the

17   Pretrial Services Office.  It's my understanding that

18   Mr. Cristea earns money through some of his businesses.  Are

19   you willing to subject yourself to that restriction?

20   A.    Yes, sir.

21   Q.    The other one is that the Defendant shall divest

22   himself of operation and control of any business entity

23   and/or venture of which he is currently involved and transfer

24   such operation and control to a third party.  And, again, if

25   he transfers control and operation to a third party who has

1    nothing to do with it, you're not going to be receiving any

2    income from those businesses.  But you're okay with that?

3    A.    I am.

4    Q.    The other one is that the Defendant shall subject

5    his -- apparently there's concern that he might contact

6    investors or he might contact witnesses.  One of the things

7    we propose, which is we think rather extreme but we think is

8    necessary or potentially necessary is that he subjects any

9    phone in the household to a pen trace or any type of

10   monitoring device so that way the government would know who

11   he's calling, who is contacting him, et cetera, et cetera, et

12   cetera.  Are you prepared to deal with that condition?

13   A.    If that's a necessary condition for me to have him,

14   absolutely.

15   Q.    And the last two conditions I think deal with

16   notification of third parties.  We are proposing that within

17   72 hours of release the Defendant shall provide a list of all

18   persons and/or entities which the Defendant has done business

19   with over the past year to the Pretrial Services Office.  Are

20   you willing to work with Cris to make sure there's a full and

21   complete and accurate list?

22   A.    I am.

23   Q.    Okay.  And then secondly, that within one week of

24   providing that information to the Pretrial Services Office,

25   the Defendant shall submit the documented proof to the

1    Pretrial Services Office that all such persons and/or

2    businesses with whom the Defendant has done business with

3    over that past year are informed of the instant indictment.

4    Are you prepared to make sure that that condition is

5    satisfied?

6    A.    I am prepared and I assure you it will be done.

7    Q.    And then the last one was a throwaway, that any other

8    condition that the Court in its judgment and wisdom chooses

9    to impose, no matter how draconian or how seemingly draconian

10   it might be, are you willing to accept that condition as

11   well?

12   A.    I am.

13   Q.    I want to go back to if he divests himself of

14   businesses.  Is there anyone ready and waiting to take over

15   that business or at least operational control of that

16   business if the Court deems it prudent to order his release?

17   A.    Yes, there is.

18   Q.    Who is that?

19   A.    His father, R.L. Cristea.

20   Q.    Okay.  And who is -- can you tell me, did you know

21   anything about the business background or the expertise of

22   Mr. Cristea to handle these type of businesses?

23   A.    I do actually.  The first time I met him he came to the

24   door in a suit, and he's -- he made quite a presence.  He

25   worked for many, many years.  I don't know the -- and I

1    apologize, please accept my apology.  I don't know all the

2    names of the companies that he worked for, but he ran a

3    multitude of companies all over the United States everywhere,

4    traveled several times, transferred.  He was CEO, president,

5    held many titles.  He's an extraordinary businessman.  He is

6    very well respected, well known in the industry.  His resume

7    is something to behold.

8    Q.    Which I have, and I'll submit it for the Court's

9    consideration.

10          And, Ms. Cristea, what about the fear that he might

11   just be a rubber stamp for Cris?

12   A.    There's no fear in that.

13   Q.    Why do you say that?

14   A.    Because I know my father-in-law.  He loves Cris too

15   much, first of all.  But second of all, I have never watched

16   him make a business decision based on somebody else's

17   decision or desire.  I've seen him many times say, well, that

18   might be what you think, but that's not what I will do.

19   Q.    So he could turn out -- so you really truly believe

20   that even if it was to Cris's detriment, he would do what's

21   right for the business?

22   A.    He absolutely will.

23   Q.    I mean, conceivably this person could turn out to be

24   the Government's star witness.  Because what he if turns out

25   and manages all of these companies and finds that it is

1    indeed a fraud as the government so alleges?  My guess is the

2    Government would be the first person he calls to the stand.

3    Despite that do you still think that knowing that's his son,

4    he would still do what's right for the company?

5    A.    I absolutely know he'll do what's right for the

6    country -- excuse me, for the company.  And I don't believe

7    that that's what will happen, so --

8    Q.    Well, the other concern too obviously, Ms. Cristea, is

9    that obviously if he's divesting himself of all these

10   businesses, as a matter of fact there was another condition

11   that we had requested, was that he -- that he divest himself

12   of control and authority over any financial accounts both

13   personal and business over which he currently has control and

14   guardian.  In other words, he couldn't even run your own

15   checking account.

16   A.    Yes.

17   Q.    Are you prepared to handle the finances where basically

18   he can't even write a check without your permission?

19   A.    I'm both willing and able.  I actually run the

20   household accounts currently.  I just had nothing to do with

21   the businesses.  I am prepared to take his name off of every

22   single checking account or anything where he has signatory

23   authority, and I can manage all of that just fine.

24   Q.    Okay.  And the last thing is if he's divesting himself

25   of control of all these businesses then how is he going to

```
 1    get income?

 2    A.    He's been offered a job by a business associate, Mr. --

 3    Q.    By Brian Wandersee?

 4    A.    Brian Wandersee, W-a-n-d-e-r-s-e-e.

 5    Q.    And what's your understanding of what he will be doing

 6    with Mr. Wandersee?

 7    A.    To be honest I am not wholly familiar with the position

 8    he's been offered, but I believe that Mr. Wandersee has

 9    outlined that for you.

10    Q.    And so -- but in any event, if he's released he does

11    have a job that he can go to that's not involving any of

12    these businesses that he might be involved with that might to

13    the Government's contention be fraudulent or not, he actually

14    has a job?

15    A.    Yes, he does.

16    Q.    And can you tell me, you know, what kind of income are

17    you earning with respect to your cater job?

18    A.    Well, it is very new.  I have been catering for 15

19    years, and actually longer than that because that's my

20    background and my job ever since I was a child.  But it's

21    been an extraordinary passion of mine.  And I've done it for

22    ministry because it hasn't been necessary as a source of

23    income.  At this time I'm stepping out in faith.  I've been

24    promoting my business.  I have quite a few people that I have

25    cooked for and served over the years that are willing to be
```

1    references for me.  And I will work as many hours and as much

2    as it takes to be a success for this so that I can support my

3    children and my family through this process.

4    Q.    Okay.  And you understand that -- as it currently

5    stands now is your salary sufficient to maintain or support

6    your family as it currently stands?

7    A.    No, it is not.

8    Q.    And just to briefly wrap up.  Could you sort of

9    describe some of the difficulties you've had, start with

10   finances since Mr. Cristea has been incarcerated.

11   A.    Well, we've basically had no income at all.  Every

12   dollar that I have received to date has been from both sets

13   of my parents, both Cris's parents and my own.  They are

14   incredible, wholly in support and aware of the situation.

15   And without them I honestly don't know what I would have

16   done.

17   Q.    What about difficulties with I guess the normal daily

18   activities of child rearing, so to speak?

19   A.    Well, as I mentioned, my four kids, they all go to

20   private school, so we do not have bus transportation.  My

21   father-in-law has taken on the role of loading the kids in

22   the car and dropping them off every single morning.  And I

23   generally do afternoon pickup.  They have been just tireless

24   in helping with baseball and batting practices, golf

25   tournaments, violin concerts.  With four kids in private

1   school, it really is endless.  Every one of my children are

2   in at least three events, so that's about 12 things a week,

3   and there aren't that many nights.  So we walk in the door

4   every day and divide tasks.

5   Q.    And you understand that if Mr. Cristea is subject to

6   home detention, the bulk of that would still fall on you

7   because I guess my understanding is that pretrial will only

8   allow him to either, A, see his attorneys, see his -- get out

9   for religious services or medical conditions, and/or to work.

10  So you understand that that burden will still fall on you if

11  he's released?

12  A.    Yes, I do.  And I'm prepared to do whatever I need to

13  do to make that work.  I also have a very dear and close

14  network of friends that I feel I will be able to draw on and

15  get support from.  And I'm confident that we'll just make it

16  work.

17  Q.    And in Cris's absence, what about the kids' scholastic

18  activities or grades, so to speak, how has that impacted?

19  A.    Well, my middle son, my eighth grader, is our most

20  sensitive child.  And he's very, very smart, but he hasn't

21  completely figured out what to do with that yet.  And he's in

22  an advanced -- well, I mean, it's a very -- it's an algebra

23  course that is advanced, and that is not my strength at all.

24  Cris is his tutor.  He goes over his homework every night.

25  And his grades are really -- they've gone down tremendously.

1    That can't change, it's not good.

2    Q.    Obviously I take it since he's been incarcerated he's

3    missed various family activities --

4    A.    Yes.

5    Q.    -- I understand; is that correct?

6    A.    Yes, that's correct.

7    Q.    Let me ask you this, Ms. Cristea, if the Court orders

8    his release subject to these conditions that we propose,

9    subject to any other additional conditions that the Court

10   might impose to satisfy and reasonably assure the safety of

11   the community, what makes you think this will be different?

12   I mean, you had the option last time to enforce it, but why

13   should the Court take reasonable comfort in your assertion

14   that you're going to make sure that he dots his Is and

15   crosses his Ts this time?

16   A.    Well, as I mentioned, my failing was in not being

17   completely aware.  I wasn't.  And I didn't try, and that was

18   wrong.  I didn't realize the seriousness of this, and I

19   didn't involve myself -- excuse me.  But I am very aware now.

20   And I will make it a point to know absolutely every detail of

21   restriction, anything that he is asked to do, and I will be

22   100 percent in support of that.  I will make sure that it is

23   taken care of in every way.  This time if I have a question,

24   I assure you it will be asked before there is a worry that

25   something could be misunderstood or not followed through.

1          But he's never been gone before.  In the 19 years

2     that we've been together he's been present at everything.

3     He's just that kind of involved man and father.  And this

4     reality that I have lived the last 84 days without him has

5     just been unbearable, and I want him back.

6     Q.    So I take it then that you have every incentive to make

7     sure he complies because that's the only way he's going to

8     stay out?

9     A.    Absolutely, every incentive.

10    Q.    And you understand that if the Judge does order his

11    release, he's going to be subject to extreme scrutiny, I

12    mean, not only from the courts, but probably from the FBI

13    agents who are investigating.  So they are probably going to

14    be looking at him -- in other words, he's going to be

15    subject, for lack of a better term, subject to a vice grip.

16    Is that something you're willing to undergo and something

17    you're willing to live through?

18    A.    As far as I'm concerned it isn't a choice, I'm not only

19    willing and able but I'm ready.  Whatever is asked, I will

20    do.

21    Q.    I mean, is your family ready to undergo this and

22    subject themselves to this type of scrutiny, not just your

23    immediate family but your extended family, your friends to

24    make sure that he doesn't commit offenses so that he

25    basically abides by the conditions of release?

1    A.    I believe that they are, yes.

2    Q.    Okay.

3              MR. SISON:  I think that's all I have, Your Honor.

4              THE COURT:  Mr. Muchnick.

5              MR. MUCHNICK:  One moment.

6              (There was a conference held off the record.)

7              MR. MUCHNICK:  I have no questions.

8              THE COURT:  Okay.  Thank you.  You may step down.

9              MR. SISON:  And, Judge, the only thing I have to

10   close out the hearing is just for the Court's considerations,

11   which would be -- and I've given these exhibits to the

12   Government.  It's Exhibit A, the Defendant's Proposed

13   Conditions of Release.  Exhibit B, a letter from R.L.

14   Cristea, who is the grandfather -- the father of Mr. Cristea,

15   who is the third-party person who would be willing to take

16   control of his businesses.  I've also attached his resume,

17   which I don't think I gave you a copy of, Steve.  This is the

18   one that I've attached, but you can look at it real quick.

19   And then the third one is Exhibit C, Your Honor, which is the

20   letter from Brian Wandersee detailing the job that he would

21   have if he's released, the nature of that job, where it would

22   be, the fact that -- the salary of that job, the hours, and

23   the nature of it, to reassure the Court that he won't be able

24   to be conducting outside extraneous business while he has

25   that job.  So I would submit these Exhibits A through C.

1           THE COURT:  There's no objection, is there?

2           MR. MUCHNICK:  No, Your Honor.

3           THE COURT:  For purposes of this hearing?

4           MR. MUCHNICK:  No, Your Honor.  I have a copy of the

5  initial appearance.  I just requested it, just received it a

6  couple days ago.  The initial appearance before Judge Collins

7  where she went over with him the third-party notification.

8  I'd just like to submit that to the Court as well.  It hasn't

9  been filed.

10          THE COURT:  All right.  I'll receive that as well.

11  Thank you.

12          MR. SISON:  And, Your Honor, that's all we have by

13  way of evidence.  The only thing I would do is brief

14  argument, if it pleases the Court.

15          THE COURT:  Well, are you going to tell me anything

16  that's not in your motion?

17          MR. SISON:  No, Judge, I don't think so.

18          THE COURT:  All right.  Then you've got it all in

19  writing.

20          And the Government doesn't have any testimony; is

21  that right?

22          MR. MUCHNICK:  We have no further testimony, just a

23  couple things that I would like to add.  But you can take

24  it --

25          THE COURT:  If I'm going to let you speak, I'll let

1   Mr. Sison speak too.  I have to listen to both of you.  Go

2   ahead.

3          MR. MUCHNICK:  Okay.  I'll be very brief.  When I

4   read Mr. Sison's motion, I was looking for evidence that the

5   matters that were discussed at the hearing, I was looking for

6   somewhere in there that they said these matters did not

7   constitute criminal behavior, and that wasn't stated in

8   there.  Apparently there's an acknowledgment in that motion,

9   and I don't think that was an oversight that the matters the

10  Government brought before Judge Collins constituted criminal

11  behavior.

12         Second, in the end of Mr. Sison's motion he said

13  that Mr. Cristea should look at this as a warning, as an omen

14  of what could happen to him.  I can assure you, Judge, when

15  the Pretrial Services Office filed this motion to revoke,

16  they didn't look at this as a warning, as an omen, they felt

17  this was very serious, and they felt that no condition or

18  combination of conditions could secure the safety of the

19  community.

20         We didn't spend three and a half hours of a

21  magistrate judge's time, not to mention the time that she

22  spent reviewing the hearing and in writing her order just to

23  give Mr. Cristea a warning.

24         And, finally, I just want to say one thing, the

25  evidence was brought before the Court in the last hearing

1    about the violation of the criminal law.  But the simplest

2    requirement that was part of it was the third-party

3    notification.  All he had to do is notify these people and

4    submit evidence of that to the Court -- to the Pretrial

5    Services Office.  And he didn't do that.  And that shows --

6    we feel that shows his feelings about his obligations under

7    the Court's bond.  And we would request that this Court enter

8    its order, give the proceedings de novo review, and enter its

9    order continuing his detention.

10              Thank you.

11              THE COURT:  Thank you.

12              MR. SISON:  Your Honor, the reason we did not

13   address the substance of the allegations against him that

14   happened at the magistrate's detention hearing was a

15   strategic one, because in my research it looks and says the

16   factual findings are subject to clear error.  And which as

17   being an appellate attorney I know that I'm subject to clear

18   error.  A lot of times whether you win or lose depends

19   on whether or not you are subject to the standard of review

20   you're looking at.

21              More importantly, though, we shouldn't be required

22   to address those allegations.  The judge found probable cause

23   that an offense was committed.  He's still entitled to a

24   presumption of innocence.  And, therefore, you know, we felt

25   strategically that it was an appropriate place to litigate

1    the merits of that potential criminal offense for this

2    hearing.  Because the issue before this Court is very simple,

3    is, A, the law is clear is that when there's been a condition

4    and a violation of release, a rebuttal of presumption incurs

5    that no conditions of release could be imposed that could

6    satisfy the safety of the community.  So the law is clear in

7    the Eighth Circuit with a bond, it basically says that the

8    burden on the Defendant is to produce evidence to rebut that

9    presumption, but that the burden of proof still remains on

10   the Government by clear and convincing evidence to show that

11   no conditions of release could reasonably assure the safety

12   of the community.

13          So let's turn to what those proposed conditions of

14   release are and whether or not they can reasonably assure the

15   safety of the community.  The first issue, the one that he

16   was -- that the judge found probable cause that a crime was

17   committed was the allegations that he lied on a financial

18   information form to get a loan.  Well, we proposed a

19   condition that addresses that.  A, that he not participate or

20   not ask for any loan, credit, any type of money whatsoever

21   without the express written permission of the Pretrial

22   Services Office.  So that condition hopefully will address

23   that.

24          The second thing that came up during the hearing was

25   third-party notification.  And you heard some testimony from

1    Ms. Cristea that, okay, at least the understanding from the

2    Defendant's point of view was maybe it's not the new

3    business, the new investors that were.  At least there was

4    testimony indicating at least his viewpoint on that.

5          But that being said, we're not even contesting that

6    there was a violation of the conditions of release.  The

7    question is whether these proposed conditions can reasonably

8    assure the safety of the community.

9          So what did we propose in this case?  We propose

10   that within 72 hours of release he produce a list of names of

11   everybody he's done business with in the past year.  And

12   basically within a short time after that provide some letter,

13   some notification, you know, to inform those people.  And

14   let's look at it from the perspective of will this really

15   ensure this third-party notification.  I promise you if

16   there's one person on that list that's not notified or one

17   person that wasn't disclosed on that list, guess who is going

18   to bear the brunt of that, it will be Mr. Cristea.  So I

19   think that condition will satisfy the third-party

20   notification.

21         Now, the more important thing, the allegations

22   regarding the running of the business.  It is the

23   Government's position that this mining business in Arizona,

24   whichever is the subject of the indictment, is fraudulent,

25   has always been fraudulent.  That being said, there are other

1   businesses that Mr. Cristea is involved with that aren't the

2   subject of the indictment, such as Charis Minerals, which is

3   a mining operation in Africa dealing with precious metals.

4   That being said, what we propose we think goes above and

5   beyond what is probably required to satisfy, reasonably

6   assure the safety of the community.  We propose that

7   Mr. Cristea divest himself of all business interests, no

8   matter what its nature, no matter what they may be and turn

9   them over to a third party.

10          So he's not going to be, A, if the Government is

11  worried about Mr. Cristea receiving investments or additional

12  funds that could be funneled to other people, I think those

13  conditions address that.  If he's divesting himself of all

14  these businesses and he's notifying them that he's divesting

15  himself of all these businesses, nobody is going to give him

16  any money.  So I think those conditions would satisfy that.

17          And then if you look to the other portions of the

18  conditions, you know, you have people who are willing to act

19  as third-party custodians.  In other words, if he violates

20  the conditions of release, these people could have their

21  house being leaned on by the government, could lose their

22  property.  The Cristeas in addition to the property that the

23  Carters are willing to post are willing to post their own

24  money if need be, which they could lose at the drop of a hat

25  if he even breaths the wrong way.

1          You know, because let's be clear, Judge, if this

2     Court is amenable to allow his release, he's going to be

3     under the tightness of scrutiny whatsoever.  You heard, for

4     example, his wife is going to be looking at him under a

5     microscope because she doesn't want him gone.  And I can

6     promise you that the Government is not going to be happy

7     about his release either.  So they are going to be looking at

8     any possible misstep that he could do to put him back in

9     jail.

10          So then you have those two parties working together

11    that I think could reasonably assure -- because that's the

12    key here, Judge -- reasonably assure the safety of the

13    community.  And where the magistrate erred was in jumping

14    immediately to the conclusion that detention was warranted.

15    Now, she can jump to that conclusion, but only if she

16    considers whether there are other less onerous alternatives

17    that could be imposed that could satisfy the safety of the

18    community.  And in this case we think there is.  We provided

19    another job for him.  We provided a higher amount of bond.

20    In this case we're proposing a $125,000 secured bond, which

21    originally it was a $10,000 unsecured bond.  We have divested

22    himself of all accounts.  He can't have any authority in any

23    accounts.

24          So we're addressing both the financial end and the

25    business end.  And all these conditions we believe, Judge, if

1   you look at it in the aggregate is a condition of, okay, will

2   these conditions either in combination with each other or all

3   of them together, will that reasonably assure the safety of

4   the community?  Even assuming that he's committed the

5   violations in the past, because we're not contesting that,

6   Judge, because the law still requires you to look at whether

7   or not these conditions that we propose will be sufficient to

8   reasonably assure the safety of the community.

9          And if you look at it from a practical perspective,

10  Judge, you heard Ms. Cristea talk about they've never been

11  through this before.  I think the record is pretty clear, I

12  think if you look back at the bail report, I think other than

13  a few municipal traffic tickets, this is really his first

14  involvement in the criminal justice system.

15         And this is a very complicated case.  When

16  Mr. Rosenblum's office took this case on and we were looking

17  at it, it's a very complicated case, it's probably going to

18  require hundreds of hours of manpower and that will

19  intimately require his defense.  He is entitled to the

20  presumption of innocence on all these charges including the

21  charge of which he was found probable cause to have committed

22  at the magistrate's detention hearing, in which we intend to

23  fully defend at his trial if and when it ever occurs.  And

24  his presence is instrumental not only to our defense but also

25  to his family.

1          As you've seen, his family is suffering.  And,

2     granted, you could make the point that he brought it upon

3     himself, and that's right, he did.  But guess what, he's paid

4     for it with almost three months of detention.  And I promise

5     you, Judge, my guess is the inclination is that if he's

6     committed these offenses before, how can I be reasonably

7     assured?  And the question again is not withstanding that can

8     these conditions reasonably assure the safety of the

9     community.  And we think they can.  And I think that is the

10    ultimate legal question that the Court must address.

11         THE COURT:  Thank you.  I will review the exhibits

12    that you've submitted along with the testimony that was

13    presented at the earlier hearing and at this hearing, and I

14    will have a ruling on your motion as soon as possible.  So

15    I'm taking the matter under advisement.  And we're in recess.

16    The Defendant is remanded to custody.

17         (Court in recess at 11:26 a.m.)

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2          I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was present

5    at and reported in machine shorthand the proceedings in the

6    above-mentioned court; and that the foregoing transcript is

7    a true, correct, and complete transcript of my stenographic

8    notes.

9          I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12         I further certify that this transcript contains

13   pages 1 – 61 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this 17th day of June, 2015.

18

19                         _____

20                         /s/ Susan R. Moran
                           Registered Merit Reporter

21

22

23

24

25